# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | | No. 06-CR-133-LRR |
| vs. | | |
| MICHAEL EDWARD KOWAL, | | **SENTENCING MEMORANDUM** |
| a/k/a "Larry William Tipton," a/k/a "Michael William Tipton," a/k/a "William Clorindo Bloom," | | |
| Defendant. | | |

———————————

## *TABLE OF CONTENTS*

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.  FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     A.   Michael Edward Kowal . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     B.   Stealing Larry William Tipton's Identity . . . . . . . . . . . . . . . . . . . 2
     C.   Stealing William Clorindo Bloom's Identity  . . . . . . . . . . . . . . . 3
     D.   Constructing the "Michael William Tipton" Identity . . . . . . . . . . . 4
     E.   Annulment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
     F.   Return to "Michael Edward Kowal" . . . . . . . . . . . . . . . . . . . . . 6
III. RELEVANT PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . 6
IV.  THREE-STEP PROCESS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
V.   THE ISSUES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
VI.  COUNTS 1, 2, 3, 4 AND 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
     A.   Step 1: Pre-Departure Advisory Sentencing Guidelines Range  . . . . . 8
          1.   Amount of Loss—USSG §2B1.1(b)(1)(C) . . . . . . . . . . . . . . . 8
               a.   Credit cards  . . . . . . . . . . . . . . . . . . . . . . . 12
                    i.    Intended loss . . . . . . . . . . . . . . . . . . . . . 12
                    ii.   Actual loss . . . . . . . . . . . . . . . . . . . . . . . 13
                    iii.  Total loss for credit cards . . . . . . . . . . . . . . 14
               b.   Attempted second mortgage  . . . . . . . . . . . . . . 15
               c.   1989 theft . . . . . . . . . . . . . . . . . . . . . . . . . 15
               d.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . 16
          2.   Ten or more victims—USSG §2B1.1(b)(2)(A)(i) . . . . . . . . . 16

      3.     *Relocation of scheme—USSG §2B1.1(b)(9)(A)* . . . . . . . . . **16**

      4.     *Acceptance of responsibility—USSG §3E1.1* . . . . . . . . . . . **17**

      5.     *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

   **B.**    **Step 2: Post-Departure Advisory Sentencing Guidelines Range** . . . . **19**

      1.     *Upward departure* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

         a.     *USSG §2B1.1, Application Note 19(A)(i)* . . . . . . . . **21**

         b.     *USSG §2B1.1, Application Note 19(A)(ii)* . . . . . . . . **21**

      2.     *Downward departure* . . . . . . . . . . . . . . . . . . . . . . . . . . **22**

      3.     *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**

   **C.**    **Step 3: Statutory Factors** . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**

   **D.**    **Alternative Sentences** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

**VII.**  **COUNTS 5 AND 7** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

**VIII.** **RESTITUTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

**IX.**   **DISPOSITION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29**

# I.  INTRODUCTION

The matter before the court is the sentencing of Defendant Michael Edward Kowal, a/k/a "Larry William Tipton," a/k/a "Michael William Tipton," a/k/a "William Clorindo Bloom."

## II.  FACTUAL BACKGROUND[1]

### A.  Michael Edward Kowal

Defendant was born in September of 1944.[2] Defendant's parents named him "Michael Edward Kowal."

### B.  Stealing Larry William Tipton's Identity

In 1988, Defendant was charged under his given name with Theft and Forgery in

---

[1] These facts are drawn from the "Stipulation of Facts for Trial Re: Counts 5 and 7" (docket no. 34-16) and are not disputed. *See infra* Part III.

[2] Rather than seal this order, the court has excluded exact birth dates and social security numbers herein. *See* LCrR 1.1.b (providing that the local civil rules apply to criminal cases); LR 10.1.h (requiring parties to redact personal data identifiers, including social security numbers and dates of birth, unless a document is filed under seal).

Arizona state court. While these Arizona state charges were pending, Defendant conducted some research and assumed a new identity. He obtained an Arizona birth certificate under the name of a dead child, "Larry William Tipton" ("Tipton Birth Certificate").[3]

In 1989, Defendant used the Tipton Birth Certificate to obtain an Arizona driver's license in Larry William Tipton's name ("Arizona License"). Using the Tipton Birth Certificate and the Arizona License, Defendant applied for and received a social security number ("SSN") in Larry William Tipton's name. The SSN ended in the four digits "0053" ("the '0053 SSN"). Defendant then used the Tipton Birth Certificate, the Arizona License and the '0053 SSN to apply for a United States passport. Defendant's passport application was denied.

On November 21, 1989, Defendant was charged under his given name in the United States District Court for the District of Arizona with Making a False Statement in Connection with a Passport Application. A warrant for Defendant's arrest issued, but he was neither arrested nor arraigned on the charge. The federal charge was ultimately dismissed in 2001.

### C. Stealing William Clorindo Bloom's Identity

In late 1989, Defendant moved to California to avoid prosecution. Defendant conducted some more research and assumed a new identity. He obtained a California birth certificate under the name of another dead child, "William Clorindo Bloom" ("Bloom Birth Certificate").[4]

Defendant used the Bloom Birth Certificate to obtain a California identification card

---

[3] Larry William Tipton was born in Wickenburg, Arizona, in December of 1944, to William Daniel Tipton and Dorothy Catherine LaMar Tipton. Larry William Tipton died when he was five years old.

[4] William Clorindo Bloom was born in September of 1944. William Clorindo Bloom died when he was four months old.

3

in Bloom's name ("Bloom ID"). In 1990, Defendant used the Bloom Birth Certificate and the Bloom ID to apply for a SSN in Bloom's name. Defendant received a SSN ending in the four digits "1447" ("the '1447 SSN"). In 1995, Defendant obtained a California driver's license in Bloom's name.

In 1998, Defendant was charged in California state court with Felony Theft. Defendant was charged under Bloom's name. Defendant was never arrested on the California state court charge.

### D. Constructing the "Michael William Tipton" Identity

In about 2000 or 2001, Defendant returned to Arizona. He resumed living under the name "Larry William Tipton." While in Arizona, Defendant agreed to marry Marilyn Egli.

On March 18, 2003, Defendant and Egli applied to the State of Iowa for a marriage license. The State of Iowa permits men and women to change their names through marriage.[5] Defendant represented on the marriage application that his "legal name before marriage" was "Larry William Tipton" and that his "legal name after marriage" would be "Michael William Tipton." Defendant used the '0053 SSN to apply for the marriage license.

On March 21, 2003, the State of Iowa issued a marriage license ("Marriage License") to Defendant and Egli. On March 23, 2003, Defendant married Egli in Cedar Rapids, Iowa. Through the marriage, Egli changed her name to "Marilyn Egli-Tipton."

---

[5] In pertinent part, Iowa law provides:

> A party may indicate on the application for a marriage license the adoption of a name change. The names used on the marriage license shall become the legal names of the parties to the marriage. . . . [T]he new name is the legal name of the requesting party.

Iowa Code § 595.5(1) (2001).

4

Defendant claims to have changed his name to "Michael William Tipton." In June of 2004, Defendant moved to Iowa, where Egli had begun residing.

On June 29, 2004, Defendant applied to the Social Security Administration for a replacement Social Security card for the '0053 SSN. Defendant requested that the name on the '0053 SSN be changed from Larry William Tipton to Michael William Tipton. The Social Security Administration ultimately granted Defendant's request.

On the same date, Defendant used the '0053 SSN to obtain an Iowa driver's license in the name of Michael William Tipton ("Iowa License"). In his application for the Iowa License, Defendant stated under oath that he previously had been known as Larry William Tipton and had changed his name to Michael William Tipton through the Marriage License.

On September 10, 2004, Defendant completed an Iowa real estate license application. Among other things, the application sought the applicant's name, SSN and "[b]irth month." Defendant knowingly represented to the Iowa Real Estate Commission that his name was Michael Tipton, his SSN was the '0053 SSN and his "birth month" was December.

On January 13, 2005, Defendant went to the office of the Linn County, Iowa, Treasurer and sought to title his automobile in the name of "Michael William Tipton." Defendant provided an employee of the Linn County Treasurer's office with an Arizona certificate of title in the name of "Larry William Tipton" and completed an Application for Certificate of Title and/or Registration. As proof of his identity, Defendant provided the Linn County Treasurer's office with the '0053 SSN in the name of "Michael William Tipton."

### E. Annulment

On May 16, 2005, Egl applied to an Iowa state court for an annulment of her marriage to Defendant. On June 8, 2005, the Iowa state court granted Egli's application

5

in an annulment decree ("Annulment"). It also changed her name back to "Marilyn Egli." The Iowa state court did not discuss Defendant's name; it simply referred to Defendant as "Michael Tipton, a/k/a Larry William Tipton, a/k/a Michael Edward Kowal."

### F. Return to "Michael Edward Kowal"

In about mid-2005, Defendant moved to near Chicago, Illinois. Defendant resumed use of his given name, "Michael Edward Kowal." Defendant obtained an Illinois driver's license in such name.

## III. RELEVANT PROCEDURAL BACKGROUND

On October 19, 2006, Defendant was charged in a seven-count Indictment. Counts 1, 3, 4 and 6 charged Defendant with Using a Fraudulently Obtained SSN, each in violation of 42 U.S.C. § 408(a)(7)(A). Count 2 charged Defendant with Making a False Statement to the Social Security Commissioner, in violation of 42 U.S.C. § 408(a)(6). Counts 5 and 7 charged Defendant with Aggravated Identity Theft, each in violation of 18 U.S.C. § 1028A(a)(1).

On December 22, 2006, Defendant pled guilty to Counts 1, 2, 3, 4 and 6 of the Indictment. On January 10, 2007, the court accepted Defendant's guilty pleas.

On December 27, 2006, Defendant waived his right to a jury trial on Counts 5 and 7 of the Indictment, pursuant to Federal Rule of Criminal Procedure 23(a). On January 16, 2007, the parties filed a "Stipulation of Facts for Trial Re: Counts 5 and 7" ("Stipulation"). On May 15, 2007, the court issued a written order on the Stipulation, in which the court found Defendant guilty of the crimes charged in Counts 5 and 7. *See* Order (docket no. 41), at 18-26.

On July 12, 2007, the United States Probation Office ("USPO") filed a Presentence Investigation Report ("PSIR"). On July 31, 2007, and August 23, 2007, the USPO filed revisions to the PSIR. On August 23, 2007, the government and Defendant filed their respective sentencing memoranda. On August 31, 2007, Defendant filed a supplemental

6

sentencing memorandum. On September 4, 2007, Defendant filed a second supplemental sentencing memorandum.

On September 6, 2007, sentencing proceedings commenced at a hearing ("Hearing"). Assistant United States Attorney Peter E. Deegan, Jr. represented the government. Attorney Webb L. Wassmer represented Defendant, who was personally present. At the conclusion of the evidence and argument, the court adjourned the Hearing and reserved ruling. When the Hearing resumes, the court shall pronounce sentence in a manner consistent with the instant Sentencing Memorandum.

## IV. THREE-STEP PROCESS

The Sentencing Guidelines are no longer mandatory. *United States v. Haack*, 403 F.3d 997, 1002 (8th Cir.) (discussing *United States v. Booker*, 543 U.S. 220 (2005)), *cert. denied*, 126 S. Ct. 276 (2005). They are advisory. *Id.* The Eighth Circuit Court of Appeals has explained that, in the post-*Booker* world, "there are essentially three steps to determining an appropriate sentence." *United States v. Sitting Bear*, 436 F.3d 929, 934 (8th Cir. 2006).

> First, the district court should determine the applicable Sentencing Guidelines range without consideration of any [Sentencing] Guidelines departure factors, because the [Sentencing] Guidelines remain an important sentencing factor. *See* 18 U.S.C. § 3553(a)(4). Second, the district court, where appropriate, should consider the departure provisions contained in Chapter 5, Part K and/or §4A1.3 of the [Sentencing] Guidelines, as those sentencing provisions have not been excised by *Booker*. The resulting range is the post-*Booker* advisory [Sentencing] Guidelines range. Third, the district court should consider the rest of the § 3553(a) factors in determining whether to impose the "Guidelines sentence" as determined in the prior steps or a "non-Guidelines sentence" driven by the other § 3553(a) considerations, and sentence the defendant accordingly. *Haack*, 403 F.3d at 1003; *see also United States v. Denton*, 434 F.3d 1104, 1114 (8th Cir. 2006) (reviewing the sentence

7

imposed by the district court under the three-part *Haack* methodology).

*Id.* at 934-35. At the Hearing, the court adhered to this three-step process. The so-called presumption of reasonableness that attends to the advisory Sentencing Guidelines range in the Eighth Circuit Court of Appeals played no part in the court's analysis. *See Rita v. United States*, 127 S. Ct. 2456, 2465 (2007) ("[T]he presumption applies only on appellate review.").

## V.  THE ISSUES

At the Hearing, the parties litigated eight legal issues: whether the court should (1) apply a four-level enhancement, pursuant to USSG §2B1.1(b)(1)(C) (2006), for causing a loss of more than $10,000 but less than $30,000; (2) apply a two-level enhancement, pursuant to USSG §2B1.1(b)(2)(A)(i), for more than ten victims; (3) apply a two-level enhancement, pursuant to USSG §2B1.1(b)(9)(A), for relocating a scheme to another jurisdiction to evade law enforcement; (4) apply a two-level decrease, pursuant to USSG §3E1.1(a), for accepting responsibility; (5) depart upward, pursuant to USSG §2B1.1, Application Note 19(A)(ii); (6) depart downward, pursuant to USSG §2B1.1, Application Note 19(C); (7) order Defendant's sentences on Counts 5 and 7 to run concurrently or consecutively to one another and the other counts of conviction; and (8) award restitution in the amount of $1,020.40 to Egli for legal fees that she incurred on the Annulment.

## VI.  COUNTS 1, 2, 3, 4 AND 6[6]

### A.  Step 1: Pre-Departure Advisory Sentencing Guidelines Range

### 1.  Amount of loss—USSG §2B1.1(b)(1)(C)

Defendant's base offense level for Counts 1, 2, 3, 4 and 6 is **6**. *See* USSG

---

[6] Because 18 U.S.C. § 1028A specifies a discrete term of imprisonment and requires that such term be imposed to run consecutively to any other term of imprisonment, the court imposes the sentences on Counts 1, 2, 3, 4 and 6 independently of those on Counts 5 and 7. *See* USSG §5G1.2(a); *id.* cmt. (n.2(A)).

8

§2B1.1(a) (setting base offense level at **6**, so long as the offense of conviction does not have a statutory maximum term of imprisonment of less than twenty years). Section §2B1.1(b)(1) provides for an increase to the base offense level based on the amount of loss involved. In pertinent part, USSG §2B1.1(b)(1) states:

> (b)   Specific Offense Characteristics
>
> > (1)   If the loss exceeded $5,000, increase the offense level as follows:
> >
> > <u>Loss</u> (Apply the Greatest)  <u>Increase in Level</u>
> >
> > (A)   $5,000 or less        no increase
> > (B)   More than $5,000    add **2**
> > (C)   More than $10,000  add **4**
> > (D)   More than $30,000  add **6**
> > (E)   More than $70,000  add **8**
> > (F)   More than $120,000 add **10**
> > (G)   More than $200,000 add **12**
> > (H)   More than $400,000 add **14**
> > > * * * *

*Id.* §2B1.1(b)(1) (emphasis in original). The Commentary to §2B1.1 provides guidance on calculating the amount of the loss. It states:

> (A)   <u>General Rule</u>.—Subject to the exclusions in subdivision (D), loss is the greater of actual loss or intended loss.
>
> > (i)   <u>Actual Loss</u>.—"Actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offense.
> >
> > (ii)   <u>Intended Loss</u>.—"Intended loss" (I) means the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur . . . .

9

（iii）   <u>Pecuniary Harm</u>.—"Pecuniary harm" means harm that is monetary or that otherwise is readily measurable in money. Accordingly, pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm.

（iv）   <u>Reasonably Foreseeable Pecuniary Harm</u>.—For purposes of this guideline, "reasonably foreseeable pecuniary harm" means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense.

\* \* \* \*

(B)   <u>Gain</u>.—The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined.

(C)   <u>Estimation of Loss</u>.—The court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference. *See* 18 U.S.C. § 3742(e) and (f).

\* \* \* \*

*Id.* §2B1.1, cmt. (n.2) (emphasis in original). The government bears the burden to prove loss by a preponderance of the evidence. *United States v. Holthaus*, 486 F.3d 451, 454 (8th Cir. 2007).

In the PSIR, the USPO recommends that the court find that the "loss" in this case is $17,934.82, and thus a four-level enhancement applies. *See* PSIR at ¶ 47 (citing USSG §2B1.1(b)(1)(C)). The USPO's loss calculation is based on $17,934.82 in actual or intended loss to Defendant's unsecured creditors, fourteen credit card companies. *See* PSIR at ¶ 39. Specifically, Defendant took out seventeen credit cards under the names "Larry William Tipton" and "William Clorindo Bloom" while he was living under those

10

identities, and they are now delinquent.[7]

The government contends that the loss is approximately $261,707.20,[8] and thus a twelve-level enhancement applies. *See* USSG §2B1.1(b)(1)(G). The government's loss calculation consists of (1) the aforementioned $17,934.82 actual loss to Defendant's unsecured creditors; (2) $30,000.00 in intended loss, because Defendant "asked [Egli] to take a second mortgage out on her home to pay approximately $30,000.00 in credit card debt," Gov't Sent. Memo. (docket no. 49-1), at 5; and (3) $213,772.38 in actual or intended loss, because Defendant stole Larry William Tipton's identity in 1989 after he "faced felony theft and forgery charges based upon his theft of $213,772.38 from his employer." *Id.* at 3.

Defendant contends that there is no "loss," and thus no enhancement applies. *See* USSG §2B1.1(b)(1)(A). Among other things, Defendant argues (1) the court should not find $17,934.82 in loss for the credit cards, because he "made the charges on the credit cards with the full intent to pay them back [and] any loss to the credit card issuers resulting from [his] change in financial circumstances are not 'reasonably foreseeable' or 'intended,'" Def. Sent. Memo. (docket no. 50-1), at 6-7; (2) the court should not find $30,000.00 in intended loss for the attempted second mortgage, because (a) the government waived its argument by not objecting to the PSIR and (b) there is no evidence that Defendant did not intend to pay back any such loan; and (3) the court should not find $213,772.38 in actual loss for any alleged theft in 1989, because (a) it is not relevant

---

[7] Defendant owes the credit card companies $28,480.00. *See* PSIR at ¶ 37. The USPO's loss calculation excludes "[i]nterest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs." USSG §2B1.1, cmt. (n.2(D(i))). In accordance with USSG §2B1.1, cmt. (n.2(F(i))), however, the USPO assessed a minimum "loss" of $500.00 per credit card.

[8] The government did not provide the court with this total figure. The court arrived at the figure by summing up amounts of loss alleged in the government's sentencing memorandum and statements at the Hearing.

11

conduct and (b) the government has not presented the court with sufficient evidence to prove that any such loss occurred.

### a. Credit cards

The court finds that Defendant is responsible for $17,934.82 in loss on the seventeen credit cards that he fraudulently obtained using the stolen identities of Larry William Tipton and William Clorindo Bloom. Here, the intended loss and the actual loss are the same—$17,934.82.

### i. Intended loss

Defendant argues that there is no evidence that he intended for the credit card companies to lose anything. He points out that, until mid-2005, he was able to keep most of his credit card accounts under the stolen identities in good standing (albeit with revolving unsecured debt). *See* Def. Exs. A-F. He claims he would have paid off the credit cards in full eventually, if only Egli would not have discovered his true identity and he had not consequently fallen on financial hardship.

Defendant's argument is a "self-serving invitation to calculate intended losses based upon [his] succeeding with his fraud and deception," and the court thus declines to accept it. *United States v. Piggie*, 303 F.3d 923, 927 (8th Cir. 2002). The court finds that Defendant intended to defraud the credit card companies out of at least $17,934.82 when he applied for their cards under false identities and made purchases with them. This is not a case in which a defendant made extraordinary efforts at restitution after his fraud was discovered. *Cf. United States v. Oligmueller*, 198 F.3d 669, 671 (8th Cir. 1999) (affirming district court's finding that a defendant's intended loss was zero, where the Defendant repaid approximately $800,000.00 to his lender after his fraud was discovered). In other words, there is nothing to corroborate Defendant's self-serving argument. Quite differently, once Defendant's fraud was discovered in mid-2005, he defaulted on his credit cards and resumed living under his given name. There is no evidence that Defendant

12

subsequently made any payments on his ill-gotten credit cards through the date of his arrest on October 31, 2006. *Cf. Holthaus*, 486 F.3d at 455-56 ("[T]he government need not prove a negative.").

### ii. Actual loss

Even if Defendant did not intend that the credit card companies suffer any loss, he caused $17,934.82 in actual loss to the credit card companies. Defendant fraudulently obtained seventeen credit cards from the fourteen companies using stolen identities, which resulted in actual harm to those companies. Defendant still owes the credit card companies $17,934.82. This was reasonably foreseeable pecuniary harm.

Defendant rejoins that there can be no actual loss as a matter of law. Defendant points out that Application Note 3(F)(i) to USSG §2B1.1 states that, "in a case involving any . . . unauthorized access device, loss includes any unauthorized charges made with the . . . unauthorized access device." USSG §2B1.1, cmt. (n.3(F)(i)). In relevant part, the Guidelines define an "unauthorized access device" in accordance with 18 U.S.C. § 1029(e) as including a credit card that is obtained "with intent to defraud." *See id.*; *id.* cmt. (n.9(A)); 18 U.S.C. § 1029(e). Defendant contends that there is no evidence that he obtained the credit cards with any intent to defraud. He claims that he intended to *deceive* the credit card companies as to his true identity, but there is insufficient evidence to prove that he intended to *defraud* them. Defendant points out that the Supreme Court has drawn a distinction between the two forms of intent in other contexts. *See, e.g., United States v. Yermain*, 468 U.S. 63, 73 n.12 (1984) (citing *United States v. Godwin*, 566 F.2d 975, 976 (5th Cir. 1978) ("Intent to deceive and intent to defraud are not synonymous. Deceive is to cause to believe the false or mislead. Defraud is to deprive of some right, interest or property by deceit.")).

The court rejects Defendant's creative yet crabbed interpretation of the advisory Sentencing Guidelines. For many of the same reasons already expressed in Part

13

VI.A.1.a.i, the court finds that Defendant obtained the seventeen credit cards with "the intent to defraud" the fourteen credit card companies. *See, e.g.*, *United States v. Akinkoye*, 185 F.3d 192, 200-01 (4th Cir. 1999) (holding that there was sufficient evidence to find that defendant "obtain[ed a credit card] with intent to defraud" for purposes of 18 U.S.C. § 1029(a)(2), where the defendant used otherwise legitimate credit cards that another defendant fraudulently obtained from credit card companies by submitting false applications in other individuals' names; "[s]ince they intended to defraud the . . . the companies issuing the cards, there is no doubt that the defendants' conduct fits squarely within the language of the statute."). Actual loss to the credit card companies accrued at the moment of Defendant's purchases under the two stolen identities. *See, e.g., Oligmueller,* 198 F.3d at 671 (applying the general rule that loss consists of amount taken at the time it was taken, because a narrow exception to the general rule under what is now Application Note 3(E) did not apply); *United States v. Bald*, 132 F.3d 1414, 1416-17 (11th Cir. 1998) ("At [the moment of purchase] the pertinent crime was complete, and an actual loss resulted. That Defendants later returned the merchandise obtained by using the credit cards is not important . . .—the credit card charges in this case already were "unauthorized charges" within the meaning of [USSG §2B1.1]. . . . [T]he amount of total purchases charged is the accurate measure of the loss."). At the moment of such purchases, Defendant intended to deprive and deprived the credit card companies "of some right, interest or property by deceit." *Godwin*, 566 F.2d at 976 (defining intent to defraud) (cited with approval in *Yermain*, 468 U.S. at 73 n.12).[9]

### iii.    Total loss for credit cards

Accordingly, the court finds that Defendant is responsible for $17,934.82 in loss to the fourteen credit card companies, the amount of both the intended loss and the actual

---

[9] Defendant also defrauded the dead children out of their credit. *See Akinkoye*, 185 F.3d at 200-01.

Case 1:06-cr-00133-LRR    Document 55    Filed 09/19/07    Page 14 of 30

loss.[10]

### b.     Attempted second mortgage

The government did not object to the PSIR's failure to include the $30,000.00 in alleged intended loss for the Egli second mortgage. The government raised the issue for the first time in its sentencing memorandum. Accordingly, the government waived this argument, and the court will not include any such sum in the loss amount. Fed. R. Crim. P. 32; *see, e.g., United States v. May*, 413 F.3d 841, 849 (8th Cir. 2005) ("The district court has no obligation to consider an objection to the presentence report that is untimely because it is raised for the first time at sentencing.").

### c.     1989 theft

Assuming without deciding that any theft by Defendant from his employer in 1989 is relevant conduct, the court finds that the government has not presented the court with sufficient evidence to prove intended or actual loss in the amount of $213,772.38. The only evidence in the record appears at Paragraph 69 of the PSIR. In pertinent part, such paragraph states: "[p]olice records reflect that the Humana Hospital director advised police that the actual cash loss as a result of the defendant's conduct amounted to $213,772.38." PSIR at ¶ 69. Although the court may rely upon hearsay in a sentencing proceeding, the hearsay itself must be sufficiently reliable. *United States v. Shevi*, 345 F.3d 675, 679 (8th Cir. 2003); *see also United States v. Fleck*, 413 F.3d 883, 894 (8th Cir. 2005) ("The rules of evidence do not apply at sentencing, but information considered by the sentencing court

---

[10] Defendant argues that all credit cards taken out under the Bloom identity should not be counted as loss, because they are not relevant conduct. The court disagrees, because Defendant's activities with respect to the Bloom credit cards "were part of the same course of conduct or common scheme or plan as the offense[s] of conviction." USSG §1B1.3(a)(2). Even if Defendant were correct, however, Defendant's intended and actual loss would still be "[m]ore than $10,000" and would still merit a four-level increase, *see* USSG §2B1.1(b)(1)(C). Only $1,500.00 in loss is attributed to three credit card companies for credit cards taken out under the Bloom name. *See* PSIR ¶ 39.

15

must have 'sufficient indicia of reliability to support [its] probable conclusion.'" (quoting *United States v. Jones*, 195 F.3d 379, 385 (8th Cir. 1999)). Here, the court finds that the hearsay in the police reports is not sufficiently reliable for the court to make findings by a preponderance of the evidence that Defendant either intended loss to his employer in 1989 or actual loss resulted. The information in the PSIR is uncorroborated and unsworn. There is no indication from the PSIR as to how the author of the police report arrived at the $213,772.38 figure. Further, it is unclear whether Defendant was ever aware of the amount in the police report. Accordingly, the court will not include any such amount in its loss calculation.

### d. Conclusion

The court finds that Defendant is responsible for $17,934.82 in loss, and thus a four-level enhancement applies. USSG §2B1.1(b)(1)(C). This brings Defendant's adjusted offense level to **10**.

### 2. Ten or more victims—USSG §2B1.1(b)(2)(A)(i)

The advisory Sentencing Guidelines provide for a two-level enhancement if "the offense . . . involved 10 or more victims . . . ." USSG §2B1.1(b)(2)(A)(i). As the court's discussion in Part VI.A.1 makes clear, Defendant's offense involved fourteen victims.[11] Accordingly, the two-level enhancement is appropriate. USSG §2B1.1(b)(2)(A)(i). This brings Defendant's adjusted offense level to **12**.

### 3. Relocation of scheme—USSG §2B1.1(b)(9)(A)

The advisory Sentencing Guidelines provide for a two-level enhancement if "the defendant relocated . . . a fraudulent scheme to another jurisdiction to evade law enforcement . . . officials." USSG §2B1.1(b)(9)(A). As indicated in Part II, Defendant has repeatedly moved across state lines to avoid prosecution for various charges. For

---

[11] If the Bloom credit cards are disregarded, Defendant's offense involved twelve credit card companies. Defendant's relevant conduct argument is, thus, of no moment.

Case 1:06-cr-00133-LRR   Document 55   Filed 09/19/07   Page 16 of 30

example, in 1989, Defendant moved from Arizona to California to avoid prosecution under his given name in the United States District Court for the District of Arizona with Making a False Statement in Connection with a Passport Application. Accordingly, the two-level enhancement is appropriate. USSG §2B1.1(b)(9)(A). This brings Defendant's adjusted offense level to **14**.

### 4. *Acceptance of responsibility—USSG §3E1.1*

In pertinent part, USSG §3E1.1 provides that, "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by **2** levels." USSG §3E1.1(a) (emphasis in original). Defendant bears the burden to prove that he is entitled to a reduction for acceptance of responsibility. *United States v. Honken*, 184 F.3d 961, 968 (8th Cir. 1999).

The Commentary to §3E1.1 states:

> In determining whether a defendant qualifies under subsection (a), appropriate considerations include, but are not limited to, the following:
>
> > (a) truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct). Note that a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction under subsection (a). A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection. However, a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility;

17

(b) voluntary termination or withdrawal from criminal conduct or associations;

(c) voluntary payment of restitution prior to adjudication of guilt;

(d) voluntary surrender to authorities promptly after commission of the offense;

(e) voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense;

(f) voluntary resignation from the office or position held during the commission of the offense;

(g) post-offense rehabilitative efforts (e.g., counseling or drug treatment); and

(h) the timeliness of the defendant's conduct in manifesting the acceptance of responsibility.

USSG §3E1.1, cmt. (n.1). "The adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." *Id.*, cmt. (n.2). "Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction." *Id.* "In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial." *Id.* "This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.*, to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)." *Id.*

The court finds that Defendant has shown that he is entitled to a decrease for acceptance of responsibility. This is one of those rare situations in which a defendant clearly demonstrates acceptance of responsibility for his criminal conduct even though he exercised his constitutional right to a trial. Here, Defendant pled guilty to five of the seven counts against him. On the remaining two counts, he waived his right to a jury trial and submitted the case to the undersigned on stipulated facts. Defendant did so in order to test the applicability of a relatively new statute to his conduct. He did not contest the essential facts of his guilt. During his allocution, Defendant accepted full responsibility for his criminal actions and did not attempt to minimize their consequences.

Accordingly, the court held that a two-level decrease for acceptance of responsibility applies. USSG §3E1.1(a); *see, e.g., United States v. Barris*, 46 F.3d 33, 35 (8th Cir. 1995) (holding that a defendant who went to trial asserting an insanity defense was not precluded from a reduction for acceptance of responsibility); *United States v. Washington*, 340 F.3d 222, 230 (5th Cir. 2003) (reversing district court's decision not to grant defendant a reduction for acceptance of responsibility, where the defendant had filed a motion to suppress but admitted to the factual conduct that formed the basis for his conviction). This brought Defendant's adjusted offense level to **12**.

### 5. *Conclusion*

Defendant's pre-departure advisory Sentencing Guidelines range on Counts 1, 2, 3, 4 and 6, based upon an adjusted offense level of **12** and a **Criminal History Category I**, is **10 to 16 months of imprisonment**.

### B. *Step 2: Post-Departure Advisory Sentencing Guidelines Range*

### 1. *Upward departure*

Application Note 19 to USSG §2B1.1 authorizes the district court to depart upward

Case 1:06-cr-00133-LRR   Document 55   Filed 09/19/07   Page 19 of 30

under certain circumstances.[12]   In relevant part, it states:

> Departure Considerations.—
>
> (A) Upward Departure Considerations.—There may be cases in which the offense level determined under this guideline substantially understates the seriousness of the offense. In such cases, an upward departure may be warranted. The following is a non-exhaustive list of factors that the court may consider in determining whether an upward departure is warranted:
>
> (i) A primary objective of the offense was an aggravating, non-monetary objective.  For example, a primary objective of the offense was to inflict emotional harm.
>
> (ii) The offense caused or risked substantial non-monetary harm. For example, the offense caused physical harm, psychological harm, or severe emotional trauma, or resulted in a substantial invasion of a privacy interest (through, for example, the theft of personal information such as medical, educational, or financial records). . . . .

USSG §2B1.1, cmt. (n.19) (emphasis in original).  At the Hearing, the government moved the court to depart upward six levels and presented evidence in the form of testimony from Egli and her daughter in support of the same.  Defendant resisted an upward departure. The government bears the burden to prove the appropriateness and extent of an upward departure.

---

[12] The court views this departure as akin to a traditional Chapter 5 departure and thus considers it, as the parties did, after its discussion of the Chapter 2 and 3 adjustments. *See, e.g.*, USSG §5K2.0.  As the court's ruling makes clear, this is clearly a case outside the "heartland," insofar the offense level determined under USSG §2B1.1 substantially understates the seriousness of Defendant's offenses.  At least one circuit court of appeals has indicated, however, that the departure is strictly "pursuant to" Application Note 19 to §2B1.1. *United States v. Genao*, 343 F.3d 578, 586-87 (2d. Cir. 2003).  The distinction, however, is largely academic and immaterial to the disposition of this case.

Case 1:06-cr-00133-LRR   Document 55   Filed 09/19/07   Page 20 of 30

### a.     USSG §2B1.1, Application Note 19(A)(i)

Defendant's primary objective in committing the offenses of conviction was to continue to avoid prosecution. This is an aggravating, non-monetary objective. Defendant's offense level determined under §2B1.1 substantially understates the seriousness of his offenses. Therefore, the court finds that a **two-level upward departure** is appropriate for this reason.[13]

### b.     USSG §2B1.1, Application Note 19(A)(ii)

Defendant's offenses also caused substantial non-monetary harm. The court found all of the testimony of Egli and her daughter at the Hearing to be highly credible. Egli's daughter's testimony was compelling, especially insofar as she told the court about the devastating effects Defendant's conduct caused her children. In committing the offenses of conviction, Defendant found a way to interject his life of lies into a good, trusting family. This family was willing to accept him unconditionally and with open arms. Defendant severely abused the family's good will and trust. The court cannot overemphasize the amount of psychological pain and suffering Defendant inflicted on this family, especially Egli's grandchildren.[14] No parent should have to explain to her young children (in this instance, a seven-year old, a six-year old and a three-year old) why a man whom they believed to be their step-grandfather was a fake and a liar and why they could

---

[13] Defendant does not argue that the imposition of an upward departure for having the primary objective of avoiding prosecution is impermissible "double counting" with the two-level enhancement for relocation of a fraudulent scheme to avoid prosecution. In any event, there is no double counting here. *See, e.g.*, *United States v. Fadl*, No. 06-3166, 2007 WL 2363185, *3 (8th Cir. Aug. 21, 2007) (discussing double counting standards and holding that there was no double counting). Indeed, Defendant concedes in his brief that "an upward departure based on efforts to avoid prosecution" is a permissible basis for departure pursuant to Application Note 19 to USSG §2B1.1. Def. Sent. Memo (docket no. 50-1), at 16 (citing *United States v. Genao*, 343 F.3d 578, 586-87 (2d. Cir. 2003)).

[14] A cold read of the written transcript of the Hearing does not do justice to Egli's daughter's testimony.

Case 1:06-cr-00133-LRR    Document 55    Filed 09/19/07    Page 21 of 30

not visit him anymore.[15] The court finds that an additional **three-level upward departure** is appropriate in this case, because Defendant caused substantial non-monetary harm to Egli's family.

Accordingly, the court shall depart upward five levels, pursuant to Application Note 19(A) to USSG §2B1.1. This brings Defendant's adjusted offense level to **17**.

### 2. *Downward departure*

Defendant urged the court to depart downward, pursuant to Application Note 19(C) to USSG §2B1.1, because "the offense level determined under this guideline substantially overstates the seriousness of the offense." USSG §2B1.1, cmt. (n.19(C)). Although the court recognizes it has the authority to depart for the various reasons expressed by Defendant, it declines to do so in this case. *Id.*[16]

### 3. *Conclusion*

Defendant's post-departure advisory Sentencing Guidelines range on Counts 1, 2, 3, 4 and 6, based upon an adjusted offense level of **17** and a **Criminal History Category I**, is **24 to 30 months of imprisonment**.

### C. *Step 3: Statutory Factors*

Defendant's advisory Sentencing Guidelines sentence on Counts 1, 2, 3, 4 and 6, after all applicable adjustments and departures, is 24 to 30 months of imprisonment. In

---

[15] Egli testified: "[My family] accepted him with open arms based on that I had accepted him, that I was in love with him, and they had no reason just as I did to think that he was anything different than what he presented himself to be. And so when you're presented as . . . a grandfather and you have children loving you, it's really hard to explain to them afterwards why he's not grandpa anymore. The bad things that he did. And how little children five years old praying for him, night after night after night, because you know, you just have to be careful with how you handle them at that age, and that everyone in my family loved and trusted him."

[16] The court also notes that, at the Hearing, Defendant conceded that a downward departure was only appropriate if the court found that he was responsible for over $200,000 in loss.

this post-*Booker* world, however, this sentence is merely advisory. In other words, the departure issue is not the ultimate inquiry.

> Departures are based on specific sections of Chapter 5, Part K of the U.S. Sentencing Guidelines (USSG) Manual and USSG §4A1.3. Reasonableness of the ultimate sentence is based on the statutory elements contained in § 3553(a). While the [issues of departures and variances] may sometimes overlap . . . district courts . . . would do well not to make post-*Booker* sentencing any more confusing than necessary by conflating the two distinct analyses.

*United States v. Zeigler*, 463 F.3d 814, 820 (8th Cir. 2006) (Hansen, S.J., concurring) (citations omitted).

The court turns to examine the § 3553(a) factors. In pertinent part, § 3553(a) directs the court to consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

> (2) the need for the sentence imposed—

>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

>> (B) to afford adequate deterrence to criminal conduct;

>> (C) to protect the public from further crimes of the defendant; and

>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

> (3) the kinds of sentences available;

> (4) the kinds of sentence and the sentencing range established

23

> for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . issued by the Sentencing Commission . . . .
>
> (5) any pertinent policy statement . . . issued by the Sentencing Commission . . . .
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).  The court need not explicitly set forth its analysis of the § 3553(a) factors here. Having considered all of these factors, the court finds that a Guidelines sentence of **30 months of imprisonment** is appropriate for Defendant on Counts 1, 2, 3, 4 and 6.  The court rejects Defendant's arguments that "a sentence sufficient, but not greater than necessary" with respect to Counts 1, 2, 3, 4 and 6 is "6-12 months."  Def. Sent. Memo. (docket no. 50-1), at 21.

### D.  Alternative Sentences

In the event that the court mistakenly calculated Defendant's advisory Sentencing Guidelines range, the court would nonetheless exercise its discretion under *Booker*, vary upward, if necessary, and impose a sentence of 30 months of imprisonment on Counts 1, 2, 3, 4 and 6.  The court so finds after considering the § 3553(a) factors.

### VII.  COUNTS 5 AND 7

Defendant is also convicted of Counts 5 and 7, the two-counts of Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A.  Each such conviction carries a mandatory statutory sentence of two years of imprisonment.  18 U.S.C. § 1028A(a)(1). Pursuant to 18 U.S.C. § 1028A(b), the court must run at least one of these two convictions consecutive to Defendant's 30-month sentence on Counts 1, 2, 3, 4 and 6.  *See* 18 U.S.C.

§ 1028A(b)(1), (2) & (4). Accordingly, the court shall run Count 5 consecutive to Counts 1, 2, 3, 4 and 6, which results in a total term of imprisonment of **54 months of imprisonment**. *Id.* The court has the discretion to run Count 7 concurrently or consecutively to this 54 month sentence. *Id.*

The parties agree that USSG §5G1.2 sets forth the applicable standards for the court to consider when deciding whether to run Count 7 concurrently or consecutively to Counts 1-6. Section 5G1.2 provides:

### §5G1.2. <u>Sentencing on Multiple Counts of Conviction</u>

(a) Except as provided in subsection (e), the sentence to be imposed on a count for which the statute (1) specifies a term of imprisonment to be imposed; and (2) requires that such term of imprisonment be imposed to run consecutively to any other term of imprisonment, shall be determined by that statute and imposed independently.

(b) Except as otherwise required by law (see §5G1.1(a), (b)), the sentence imposed on each other count shall be the total punishment as determined in accordance with Part D of Chapter Three, and Part C of this Chapter.

(c) If the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, then the sentences on all counts shall run concurrently, except to the extent otherwise required by law.

(d) If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. In all other respects, sentences on all counts shall run concurrently, except to the extent otherwise required by law.

(e) In a case in which subsection (c) of §4B1.1 (Career Offender) applies, to the extent possible, the total punishment

25

is to be apportioned among the counts of conviction, except that (1) the sentence to be imposed on a count requiring a minimum term of imprisonment shall be at least the minimum required by statute; and (2) the sentence to be imposed on the 18 U.S.C. § 924(c) or § 929(a) count shall be imposed to run consecutively to any other count.

USSG §5G1.2 (emphasis in original). Whereas the government asks the court to run Count 7 consecutively, Defendant asks the court to run it concurrently.

The Commentary to §5G1.2 contains specific provisions when convictions for 18 U.S.C. § 1028A are involved. Application Note 2(B) provides:

> Multiple Convictions Under 18 U.S.C. § 1028A.—Section 1028A of title 18, United States Code, generally requires that the mandatory term of imprisonment for a violation of such section be imposed consecutively to any other term of imprisonment. However, 18 U.S.C. § 1028A(b)(4) permits the court, in its discretion, to impose the mandatory term of imprisonment on a defendant for a violation of such section "concurrently" in whole or in part, only with another term of imprisonment that is imposed by the court at the same time on that person for an additional violation of this section, provided that such discretion shall be exercised in accordance with any applicable guidelines and policy statements issued by the Sentencing Commission. . . ."
>
> In determining whether multiple counts of 18 U.S.C. § 1028A should run concurrently with, or consecutively to, each other, the court should consider the following non-exhaustive list of factors:
>
> (i) The nature and seriousness of the underlying offenses. For example, the court should consider the appropriateness of imposing consecutive, or partially consecutive, terms of imprisonment for multiple counts of 18 U.S.C. § 1028A in a case in which an underlying offense for one of the 18 U.S.C. § 1028A offenses is a crime of violence or an offense enumerated in 18 U.S.C. § 2332b(g)(5)(B).

26

Case 1:06-cr-00133-LRR   Document 55   Filed 09/19/07   Page 26 of 30

> (ii) Whether the underlying offenses are groupable under §3D1.2 (Groups of Closely Related Counts). Generally, multiple counts of 18 U.S.C. § 1028A should run concurrently with one another in cases in which the underlying offenses are groupable under §3D1.2.
>
> (iii) Whether the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2) are better achieved by imposing a concurrent or a consecutive sentence for multiple counts of 18 U.S.C. § 1028A.

USSG §5G1.2, cmt. (n.2(B)) (emphasis in original).

The court holds that Count 7 should be run concurrently to Count 5. The court finds that the first and third factors weigh slightly in favor of consecutive or partially consecutive sentences. The second factor, however, weighs more strongly in favor of concurrent sentences, because the underlying offenses (i.e., Counts 1, 2, 3, 4 and 6) were grouped under §3D1.2.

Accordingly, the court shall run Count 5 and Count 7 concurrently with one another but consecutive to Counts 1, 2, 3, 4 and 6. The court finds that a total term of imprisonment of **54 months of imprisonment** is appropriate for Defendant. The court so finds after considering all of the § 3553(a) factors.

## VIII. RESTITUTION

The evidence presented at the Hearing shows that Egli spent $1,020.40 on attorneys' fees to obtain the Annulment. *See* Gov't Ex. 3. At the Hearing, counsel for Defendant pointed out that, in the Annulment, Egli agreed to pay her own attorneys' fees. *See* Def. Ex. G. Defendant resisted any award of restitution on this basis. Neither party cited any legal authority to the court.

Counts 1 charged Defendant with Using a Fraudulently Obtained Social Security Number to obtain an Iowa marriage license, in violation of 42 U.S.C. § 408(a)(7)(A). In relevant part, 42 U.S.C. § 408(b) provides:

27

**(b) Restitution**

**(1)** Any Federal court, when sentencing a defendant convicted
of an offense under subsection (a) of this section, may order,
in addition to or in lieu of any other penalty authorized by law,
that the defendant make restitution to the victims of such
offense specified in paragraph (4).

**(2)** Sections 3612, 3663, and 3664 of Title 18 shall apply with
respect to the issuance and enforcement of orders of restitution
to victims of such offense under this subsection.

**(3)** If the court does not order restitution, or orders only partial
restitution, under this subsection, the court shall state on the
record the reasons therefor.

**(4)** For purposes of paragraphs (1) and (2), the victims of an
offense under subsection (a) of this section are the following:

> **(A)** Any individual who suffers a financial loss
> as a result of the defendant's violation of
> subsection (a) of this section.

42 U.S.C. § 408(b) (footnote omitted, emphasis in original). The government bears the
burden to prove the amount of restitution by a preponderance of the evidence. *United
States v. DeRosier*, No. 07-1006, 2007 WL 2669436, *5 (8th Cir. Sept. 13, 2007).

Section 408(b) grants the court the authority to award restitution to a wide array of
individuals, namely, "[*a*]*ny individual* who suffers a financial loss as a result of the
defendant's violation of subsection (a) of this section." 42 U.S.C. § 408(b) (emphasis
added).[17] It contains no statutory exception for cases in which the Defendant and the

---

[17] The court cannot find any cases discussing the propriety of an award of
restitution under 42 U.S.C. § 408(b). The authority to award restitution was added to
§ 408(b) in 2004 by the Social Security Protection Act of 2004, PL 108-203, § 209 (Mar.
2, 2004). Prior thereto, courts had held that victims of Title 42 offenses were generally
(continued...)

Case 1:06-cr-00133-LRR   Document 55   Filed 09/19/07   Page 28 of 30

victim have entered into a private agreement under which the victim agrees to bear the monetary costs of the Defendant's criminal conduct. Indeed, Defendant cites no legal authority in support of his argument that restitution is precluded as a matter of law; he only argued half-heartedly at the Hearing that "I don't know that she actually has a loss." To the contrary, the court finds that Egli suffered a financial loss as a direct result of the specific conduct underlying Count 1. *See United States v. Akbani*, 151 F.3d 774, 780 (8th Cir. 1998) (affirming award of attorneys' fees to victim pursuant to 18 U.S.C. § 3663, in spite of the defendant's unsubstantiated claim that the parties had executed a private release); *see also United States v. Jones*, 56 F.App'x 295, 296 (8th Cir. 2003) (affirming award of restitution, pursuant to 18 U.S.C. § 3663A, for "$116,779.50 in legal fees and expenses" that "were triggered by the specific conduct that was the basis for the offense of conviction").

Accordingly, the court finds that restitution is appropriate and shall order Defendant to pay Egli $1,020.40.

## IX.  DISPOSITION

When the Hearing resumes, the court shall sentence Defendant in a manner consistent with the instant Sentencing Memorandum. The court shall also order Defendant to pay Egli $1,020.40 in restitution.

---

[17](…continued)
not entitled to restitution. *See, e.g., United States v. Fore*, 169 F.3d 104, 110 (2d Cir. 1999).

Case 1:06-cr-00133-LRR   Document 55   Filed 09/19/07   Page 29 of 30

**IT IS SO ORDERED.**

**DATED** this 19th day of September, 2007.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

30